(C. D. 1501)

DOUGLAS PAPER COMPANY
BORDER BROKERAGE COMPANY } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 18, 1953)

*Lawrence, Tuttle & Harper* (*George R. Tuttle, Frank L. Lawrence,* and *Patrick J. Donohue* of counsel) for the plaintiffs.

*Charles J. Wagner,* Acting Assistant Attorney General (*Dorothy C. Bennett, Arthur R. Martoccia, Richard H. Welsh,* and *Richard M. Kozinn,* special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: The merchandise in controversy in this case consists of toilet paper in rolls. It was classified by the collector of customs at the port of Seattle, Wash., as manufactures of paper, not specially provided for, within the provisions of paragraph 1413 of the Tariff Act of 1930 and assessed with duty at the rate of 35 per centum ad valorem. Plaintiffs have alleged that the collector's classification is erroneous and assert the more appropriate application of the provision in said paragraph 1413, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, for "Papers * * * cut * * * into designs or shapes, such as * * * bands, strips, or other forms," which are dutiable at the rate of 15 per centum ad valorem.

Various other claims are set forth, both in the protest itself, and in amendments thereto, to the effect that the involved toilet paper should have been classified either as tissue paper, or creped or partly creped paper, or as articles made from crepe paper, dutiable at the rates provided therefor, dependent upon weight or value as the case may be, in paragraph 1404 of said act, as modified by said trade agreement, and by virtue of the proviso to said paragraph 1404 in the Tariff Act of 1930.

While these alternative claims are not expressly abandoned, and were to some extent encompassed by the evidence produced by plaintiffs at the trial, they are not pressed in the brief filed on behalf of plaintiffs. In view, however, of the proviso to said paragraph 1404, which we quote, *infra*, we deem it pertinent also to recite in full those portions of the Tariff Act of 1930, and the modifications thereof, which have a bearing upon the issues raised herein.

Paragraph 1404 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, provides as follows:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1404 | Papers commonly or commercially known as tissue paper, stereotype paper, and copying paper (except copying paper valued at more than 15 cents per pound), india and bible paper, condenser paper, carbon paper, coated or uncoated, bibulous paper (except bibulous paper valued at more than 15 cents per pound), pottery paper, tissue paper for waxing, and all paper similar to any of the foregoing, not specially provided for, colored, or uncolored, white or printed: | |
| | Weighing not over six pounds to the ream, and whether in sheets or any other form. | 3¢ per lb. and 10% ad val. |
| | Weighing over six pounds and less than ten pounds to the ream. | 2½¢ per lb. and 7½% ad val. |
| | *    *    *    *    * | *        * |
| 1404 | Crepe paper, commonly or commercially so known, including paper creped or partly creped in any manner: | |
| | Valued at not more than 12½ cents per pound. | 1½¢ per lb. and 3¾% ad val. |
| | Valued at more than 12½ cents per pound. | 3¢ per lb. and 7½% ad val. |

Paragraph 1404 of the Tariff Act of 1930 further reads:

* * * *Provided,* That no article composed wholly or in chief value of one or more of the papers specified in this paragraph shall be subject to a less rate of duty than that imposed upon the component paper of chief value of which such article is made: * * *

Paragraph 1413 of the Tariff Act of 1930, as modified by said General Agreement on Tariffs and Trade, provides in part as follows:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1413 | Papers and paper board and pulpboard, including cardboard and leatherboard or compress leather, embossed, cut, die-cut, or stamped into designs or shapes, such as initials, monograms, lace, borders, bands, strips, or other forms, or cut or shaped for boxes or other articles, plain or printed, but not lithographed, and not specially provided for. | 15% ad val. |

At the trial of this case there were introduced into evidence samples of the types of pulp used as ingredients in the paper at bar, together with the orders directing its manufacture, and samples of the various kinds of paper resulting from each of the several processes undertaken in the production of the instant merchandise in its condition as imported. In addition, there is in evidence a photograph of the machine which perforates, slits, and winds the finished product.

In the course of manufacturing the Purex toilet tissue rolls here involved, bleached sulphite, a chemical pulp; bleached sulphate, a Kraft chemical pulp; and bleached ground wood, a mechanical pulp (plaintiffs' illustrative exhibits 2, 3, and 4, respectively), in proportions of 70 per centum chemical pulp, 30 per centum mechanical pulp, are placed in a hydro-pulper where the pulp is reduced to extremely small fibers. The fibers are then fed through hydro-refiners, and through Jordan machines, which further reduce them. These are then passed into the wet end of a Fourdrinier-type paper machine, through a selective wire with sufficient water to float the fibers over the wire. As the excess water drops through the holes in the wire, the sheet of paper is formed. This sheet is picked off the wire with woolen felts and drawn over a large Yankee drier which carries 125 pounds of steam. This process dries the sheet, and if the drier is not treated, an MG machine-glazed flat tissue results (plaintiffs' illustrative exhibit 5).

If, however, it is desired to produce crepe paper, a somewhat different drying process is employed. Actually, however, it is necessary first to manufacture the paper as a tissue before it can be creped. In the case of crepe paper, the drier is treated with starch and glue, so as to make the sheet adhere to the drier. The sheet is then crowded up against what is known as a doctor blade, before being peeled off the heated drier. According to the specifications for the involved paper, the drier was run at a speed of 1,125 feet per minute. The paper is pulled off the drier in a 120-inch roll at a reduced speed—in this case 910 feet per minute—which tends to crowd the sheet together, giving it a creped or accordion-plait effect (plaintiffs' illustrative exhibit 6).

The 120-inch sheet or web, as it is called, is rewound into a jumbo roll, the rewinder revolving more slowly than the jumbo roll. This has the effect of reducing the crepe to an average of 15 to 16 per centum (plaintiffs' illustrative exhibit 7). The jumbo roll is removed by means of a hydraulic lift and carried to a second winder, where the "sheet goes through two steel calender rolls, which iron off the hot spots and soften the sheet." In this rewinding process, the crepe is reduced by approximately 4 per centum (plaintiffs' illustrative exhibit 8). The second winder then slits the 120-inch roll into two rolls of a desired width, in this case 63¼ inches and 59 inches. These two rolls are then placed on a toilet winder (plaintiffs' illustrative exhibit 9) where they are converted into small rolls of toilet paper.

This last conversion process is described as follows:

A. The parent roll is put on the back stand of the machine. The web of paper is pulled over a bed roll. The bed roll is machined so that perforating blades in a perforating roll, which sits directly above it, will perforate the web of the sheet as it passes over this bed roll.

Q. At what distances on the sheet do these perforations occur?—A. The perforations are set at 5 inches.

Q. And why is the paper perforated?—A. To make it easy to tear off.

Q. What do you mean by that?—A. Particularly—well, perforations are put in a sheet of paper so that one part of the paper can be torn from the other without it, as we call ribboning or stripping.

Q. Tearing jagged or lengthwise?—A. Yes.

Q. Now will you continue, please?—A. The web of paper which is now perforated is pulled over a slitter board—just a flat board—the width of the machine, and individual slitters slit the paper into strips 4¼ inches wide. The paper now in strips is fed onto a mandrel, on which have already been placed by the operator—in our case, 14—on which have already been placed cores to receive the individual strips.

Q. What are the cores made of?—A. The cores are made of chip board.

Q. In the form of a cardboard?—A. In the form of, yes, a cardboard.

Q. Yes. Go ahead, Mr. Radcliffe.—A. The machine is geared so that at a set number of sheets, in the case of Purex, when 700 sheets have been wound onto the cores the machine automatically slows down, a new mandrel is flipped into

place, the one that is filled is taken off by the operator, and the rolls which are now slit and perforated into individual rolls are placed on a table, where a girl packer puts them through an automatic labeling machine.

It seems clear from the foregoing description of the method of manufacture of the instant commodity that, although in its initial stage of processing it is tissue paper, in its final form it has become crepe paper which, before being wound on cardboard cores, has been slit into strips 4¼ inches wide and perforated at intervals of 5 inches. In the average roll of toilet paper which is ready for ultimate use, there are 699 rows of perforations, or 700 undetached sheets. Each roll is, therefore, 4¼ inches wide and approximately 97 yards long.

Counsel for the plaintiffs urge that the "instant paper was produced by a method and in a form contemplated by [the] initial portion of paragraph 1413," and we are of opinion that a literal interpretation of the words relied upon, in the light of the factual record here presented, compels an acceptance of this contention. In the very strictest sense, the merchandise before us consists of strips of crepe paper which have been cut from a parent roll. No more apt expression for a description of this merchandise can be found than that it is paper, cut into shapes in the form of strips. Thus, the description itself invokes almost the identical language employed by Congress in the provision in question.

A somewhat comparable article was before this court in the case of *Berg Friedberg & Co.* v. *United States*, 2 Cust. Ct. 578, Abstract 40644, and a like conclusion reached concerning its classification. The merchandise there involved was known as a serpentin. It consisted of a strip of plain colored paper, approximately one-eighth of 1 inch in width, which had been wound as a coil, with a loop on one end to permit holding when in use. In deciding that paper serpentins fit "the very explicit language employed" in the first portion of paragraph 1413, *supra*, and that they were "inherently paper in strips," this court stated:

In our opinion the provision for "Papers * * * embossed, cut, die-cut, or stamped into designs or shapes, such as initials, monograms, lace, borders, bands, strips, or other forms, or cut or shaped for boxes or other articles, * * * not specially provided for" under which the instant merchandise is claimed to be dutiable is what might be termed an intermediate provision between the provision for paper, as mere material, and the one for manufactures of paper. The precise language of said provision indicates an intent to include therein papers in the forms specified which may dedicate them to a particular use, thereby excluding them from the provision for paper as material which may have a variety of uses, and at the same time not being advanced to a condition where they are to be deemed manufactures of paper.

A "strip" is defined in the 1948 edition of Webster's New International Dictionary of the English Language as:

A narrow or relatively long piece; as, a *strip* of cloth; a *strip* of land.

Paper cut to a width of 4¼ inches, in lengths of approximately 97 yards, responds as well to the definition of a strip, as paper one-eighth of 1 inch wide and of an undisclosed length, and the same considerations for classification of the former as govern the classification of the latter should apply.

Moreover, had the individual sheets of toilet paper been separated each from the other by cutting or slitting instead of being perforated for ready separation, then there would result pieces of paper generally similar in shape to the paper napkins which formed the subject of decision in the case of *Freund Mayer & Co., Inc.* v. *United States,* 39 C. C. P. A. (Customs) 123, C. A. D. 474. They would also bear a resemblance to the filter paper disks involved in the cases of *United States* v. *W. X. Huber Co.,* 30 C. C. P. A. (Customs) 183, C. A. D. 231, and *United States* v. *H. Reeve Angel & Co., Inc.,* 33 C. C. P. A. (Customs) 114, C. A. D. 324. Both of these shapes of paper were held to fall within the provision in said paragraph 1413 for papers, cut to shape, and we do not doubt that individual sheets of toilet paper brought to that shape by a cutting process would merit the same treatment.

Neither do we believe that the omission to cut through the paper at the points in the sheet or strip where the paper was perforated would warrant a different conclusion here. The evidence is that the sheets were perforated for the purpose of facilitating separation or tearing. To all intents and purposes then the paper as imported consists of sheets of toilet paper 4¼ inches wide and 5 inches long. *United States* v. *Buss & Co.,* 5 Ct. Cust. Appls. 110, T. D. 34138.

But whether as cut sheets of paper, or as cut strips of paper, it seems clear that the paper here in issue has been cut to shape within the meaning and intent of that portion of paragraph 1413, *supra,* with which we are here concerned, and the instant merchandise is covered by that provision.

We come now to a consideration of whether the proviso to paragraph 1404, *supra,* which has been construed as a minimum rate provision (*Henry Pollak (Inc.)* v. *United States,* 18 C. C. P. A. (Customs) 219, T. D. 44402), has any application to the importation at bar. For the purposes of this discussion, and in view of the conclusion which we have reached upon this phase of the case, it is sufficient for us to assume, without necessarily making a finding to that effect, that the 15 per centum rate of duty provided for in paragraph 1413, as modified, *supra,* would be less than the rate at which this merchandise would be taxed if it were subjected to the combined ad valorem and specific rates imposed upon crepe paper valued at more than 12½ cents per pound in said paragraph 1404, as modified. The single query under this proviso is "Are these rolls of crepe paper *articles* composed wholly or in chief value of crepe paper?" If they

are, the proviso is applicable under the foregoing assumption, other-wise not.

Of course, in the broad sense of the word, as signifying any thing of matter in the physical world, these rolls of paper are articles, as, in that sense, is the paper from which they were cut. But we think that some more restricted meaning was intended for the word in the particular context in which it is found in paragraph 1404. The article there referred to is one "composed wholly or in chief value of one or more of the papers specified in this paragraph," and presupposes a thing manufactured in whole or in part from one or more of the speci-fied papers. Since the component paper is itself enumerated in the paragraph, no useful purpose is served in so construing the proviso as to encompass any of the specified papers which have not been manu-factured into new and different entities.

So limiting the proviso, can it be said that rolls of toilet paper have ceased to be paper *per se* and have been converted into articles made from paper? We do not think so. In the case of *United States* v. *Arkell Safety Bag Co.*, 22 C. C. P. A. (Customs) 258, T. D. 47210, it was held that for appraisement purposes, rolls of wrapping paper were nothing more than wrapping paper itself, and hence similar to and commercially interchangeable with other rolls of wrapping paper of smaller diameters.

In the case of *Hamilton et al.* v. *United States*, 167 Fed. 796, T. D. 29519, decided before the predecessor to the instant proviso became a law, the merchandise involved was paper doilies, the lace-like effects of which were produced from plain paper in a single stamping opera-tion. The court there observed that the doilies were nothing more than the paper from which they had been stamped and had not been manufactured into articles having a different use, such as envelopes, bags, or boxes. They were held to be more properly provided for as all other paper, not specially provided for, than as manufactures of paper under the Tariff Act of 1897.

In the recent case of *C. S. Allen Corp.* v. *United States*, 38 C. C. P. A. (Customs) 48, C. A. D. 438, rolls of paper on which were printed at regular intervals, for convenience in cutting, the country of origin, the ingredients, and the names of the candy articles about which the paper, after cutting, was to be wrapped, did not cease to be paper or become articles made from paper, within the sense and meaning of the wax-coated paper provisions of paragraph 1405 of the Tariff Act of 1930.

Neither can it be said that the merchandise at bar has ceased to be paper or that it has become an article made or manufactured from paper. It serves no other purpose than the paper itself. It has been packaged and wrapped in a form which enables it to be used more conveniently, but its identity as paper has not been lost.

We are not unmindful of the fact that in the *Huber* case, *supra*, the court rejected the collector's assessment of duty upon an importation of coffee filter papers under the minimum rate provision of paragraph 1404 as articles composed of tissue paper on the theory only that the paper from which the disks had been cut was not tissue paper. Whether or not filter paper disks were "articles" within the contemplation of said paragraph 1404 did not enter into the court's discussion. It was not, however, a necessary or relevant consideration in view of the finding in the first instance that the disks were not composed of tissue paper.

The first portion of paragraph 1413, *supra*, provides for the importation at bar with greater particularity than the *eo nomine* designation of crepe paper. Since it is crepe paper, processed but not so far advanced as to become an article made from crepe paper, the principal claim advanced by the plaintiffs for classification and assessment within the provisions of paragraph 1413, as modified, for papers, cut to shape, at the rate of 15 per centum ad valorem, is sustained.

Judgment will be entered accordingly.