BEFORE THE SECOND DIVISION, SEPTEMBER 30, 1965

No. 69566.—Border Brokerage Co., Inc. *v.* United States, protest 63/16013 (Seattle).

RAO, Chief Judge: The instant protest relates to an importation of rolls of facial tissue paper invoiced as "SCOTTIES 2 PLY FACIAL TISSUE—IN PARENT ROLLS (UPWRAPPED)—WHITE," the dimensions being: Core—3 inches, diameter—27 inches, and width—8$\frac{7}{16}$ inches. The collector of customs at the port of entry classified this merchandise as crepe paper, commonly or commercially so known, valued at not more than 12½ cents per pound, pursuant to the provisions of paragraph 1404 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and, accordingly, assessed duty thereon at the rate of 1½ cents per pound and 3¾ per centum ad valorem.

It is the claim of plaintiff that said merchandise is more specifically provided for in paragraph 1413 of said act, as modified by said General Agreement on Tariffs and Trade, as "Papers * * * cut * * * into designs or shapes, such as * * * bands, strips, or other forms * * *" and thereby dutiable at the rate of 15 per centum ad valorem.

It is apparent from the competing provisions in this case and the description of the merchandise involved herein that the question at issue is whether crepe paper in rolls is more specifically provided for as paper, cut into strips, than as crepe paper. This is a question which has previously occupied the attention of this and our appellate court with results which we believe are dispositive of the controversy here.

In the case of *United States* v. *Border Brokerage Company*, 48 CCPA 38, C.A.D. 760, it was held that rolls of paper toweling, cut into widths of either 9½ or 10⅝ inches, were more precisely described by the provision for paper, cut into strips, than for crepe paper and, hence, dutiable at the rate of 15 per centum ad valorem, as provided in said paragraph 1413, as modified.

Similarly, in *Douglas Paper Company* and *Border Brokerage Company* v. *United States*, 30 Cust. Ct. 87, C.D. 1501, this court held that an importation of toilet paper in rolls was provided for in said paragraph 1413 with more particularity than in paragraph 1404, stating:

> Counsel for the plaintiffs urge that the "instant paper was produced by a method and in a form contemplated by [the] initial portion of paragraph 1413," and we are of opinion that a literal interpretation of the words relied upon, in the light of the factual record here presented, compels an acceptance of this contention. In the very strictest sense, the merchandise before us consists of strips of crepe paper which have been cut from a parent roll. No more apt expression for a description of this merchandise can be found than that it is paper, cut into shapes in the form of strips. Thus, the description itself invokes almost the identical language employed by Congress in the provision in question.

The record in the instant case, which consists solely of the uncontradicted testimony of a single witness called on behalf of plaintiff, together with an illustrative sample of a roll of paper in the condition of the imported merchandise (plaintiff's exhibit 1) and a box of Scotties facial tissues (plaintiff's exhibit 2), shows the merchandise at bar to be strikingly similar to that involved in the cited cases. The process of manufacture was described as follows:

> A. The paper is manufactured, to start with, by establishing a formula or recipe for different pulps and chemicals that will go into the manufacture of the paper, so that it will have certain characteristics at the time it comes off the paper machine. Those pulps are blended together, in a water solution, are pumped over a paper machine—and the paper machine is essentially a formation device to even out the fibers on a moving wire screen—and after the paper is formed on that moving wire screen it is dried first by pressing between rollers and felts, and then additionally by drying over what we call a Yankee Drier, which is a steam-heated drum several feet in diameter * * *. After the paper is dried on the steam-heated drum, it is eventually cut off with a knife blade, which we call a Doctor, in which folds—or, as we call it, crepe—are put into the paper. The paper is then run over between two rollers which tend to iron it out and flatten it some, and then it is wound up into a big jumbo roll, which we call the reel.
>
> *   *   *   *   *   *   *
>
> A. After the paper comes off the paper machine, two of the jumbo rolls are put together on to a rewinder. At this time the paper is rewound, and slit to the actual width which we want. * * *
>
> Q. Now, is that the point that you saw the merchandise that was entered into the United States?—A. That is the point in which we purchase the merchandise.
>
> Q. At Everett?—A. Right.

The witness also stated that the width of the paper at the time of importation (plaintiff's exhibit 1) was identical with the width of the finished "Scotties" tissues (plaintiff's exhibit 2) within, of course, the normal tolerances of measurement. In discussing the process of "slitting," the witness testified that it is the procedure by which the paper rolls are cut to certain designated widths. Finally, the witness stated that the merchandise in issue was "slit" prior to importation, it having arrived at the Scott Paper Co. plant in trimmed rolls, 8$\frac{7}{16}$ inches wide.

In view of the conclusions reached in the cited cases, we are of opinion that the subject rolls of facial tissue paper are more specifically provided for in para-

graph 1413, as modified, *supra,* as paper, cut into shapes, such as strips, than as "crepe" paper within said paragraph 1404, as modified, *supra.* The manufacturing processes described herein incorporate those very features which were regarded as *sine qua non* to a paragraph 1413 classification by this court in its opinion in the *Douglas* case, *supra.* Testimony in the instant record is undisputed that the paper was "slit" or "cut" prior to importation. In the *Border Brokerage* case, *supra,* our appellate court adopted as the meaning of the term "strip" a "narrow or relatively long piece; as, a *strip* of cloth; a *strip* of land." [Italics quoted.] That a "strip" was the shape produced by the "slitting" process in the instant case is evident from the fact that the resulting product was stated to be more than 2 miles in length and less than 9 inches in width.

For the purposes of paragraph 1413, the paper became a "strip" when the "slitting" operation was completed, that is, when the paper was cut from the original parent roll to the desired width. The fact that this 2-mile strip of paper was placed on a roll is not, in the least, material to the issue at bar, as our appellate court noted in the *Border Brokerage* case, *supra.*

Based on the foregoing considerations, we hold that the instant rolls of facial tissue are dutiable at the rate of 15 per centum ad valorem, as provided for in paragraph 1413, as modified, *supra,* as papers, cut into shapes, such as strips. The claim of the plaintiff to that effect is sustained. All other claims are, however, overruled.

Judgment will be entered accordingly.